**CONYERS, et al v. PINELLAS COUNTY BOARD OF PUBLIC INSTRUCTION.**
No. 16634.
Circuit Court, Pinellas County.
September 19, 1969.

Michael Plunkett, Clearwater, for plaintiffs.

Edward A. Turville, St. Petersburg, for defendants.

CHARLES R. HOLLEY, Circuit Judge.

*Order and opinion:* On September 11, 1969 plaintiffs filed their complaint raising the question of the constitutionality of the enforcement procedures of the Pinellas County school system with respect to regulations of the Pinellas County public schools concerning the length of plaintiffs' hair. Essentially the issue raised by this complaint is whether the public schools must accord due process of law — charges, notice of hearing, time to prepare for hearing, hearing, confrontation of witnesses, appeal, stay pending appeal — in enforcing the school regulations respecting hair length. Obviously the issue would also apply to regulations respecting conduct, attire and similar matters. I considered that the complaint raised a justiciable issue and one which, to my best knowledge, has not been directly ruled upon by any court of appellate jurisdiction in this country. Nor have I been made aware of any ruling directly on this issue by *any* court in this country.

The complaint requested a temporary injunction. Because this court could see no damage which could result from a temporary injunction and the sworn complaint set up facts which could be considered as showing irreparable damages to plaintiffs in the absence of an injunction, I issued a temporary injunction which had the effect of holding everything in abeyance until hearing by this court September 19, 1969.

It was and is my opinion that anyone appearing before this court alleging facts showing irreparable damage and creating a justiciable issue has an absolute right to his day in court and arbitrary denial of that right would be grossly improper. The preservation to every person of his right to his day in court is essential to a peoples' government. The question presented by the complaint is whether this right extends to public school disciplinary actions.

The public school system of this country and this state did not spring full blown to what we have today. It is interesting that the constitution of the state of Florida of 1885 specified that "The Legislature shall provide for a uniform system of public free schools, and shall provide for the liberal maintenance of the same." Even in our constitution approved by the people in 1968 it was felt necessary to specify that: "Adequate provision shall be made by law for a uniform system of free public schools . . ."

During the boyhoods of John Adams, Thomas Jefferson, Benjamin Franklin and their contemporaries and for decade on decade following there was, as a general rule, no such thing as a free public school. It was only during the latter half of the nineteenth century

that the idea of free public schools was generally accepted as being within the requirements of the state governments providing for the general welfare. Prior to that time most schools were privately created and privately supported by the parents of the children attending.

Until recent years pre-university schooling was deemed the responsibility and prerogative of the family. Most people had little or no schooling. The family bible was the primary, secondary and other reading material. Sums were taught in terms of the number of posts required to fence a particular parcel of the family land. Schooling of reading, writing and arithmetic was in the same category as hunting, plowing, carpentry, morals and manners.

The general welfare first dictated that public schools be provided for the purpose of assuring everyone who would or could take advantage of it the opportunity to be literate and understand mathematics. The scope of the public school was gradually broadened through the years to keep pace with the growth of the general welfare; as literacy and material wealth increased, the citizens more and more transferred to the public schools the educational responsibilities of the family. What the father learned following his father in the furrow, the son learned in vocational education. What the mother learned in helping her mother make clothing for the family, the daughter learned in home economics. From providing reading, writing and arithmetic and practical training in the art of everyday living, our citizenry has required the public schools to go into the cultural areas of music, painting and the art crafts generally, and even as to such esoteric things as driver education.

What aspect of rearing, which one hundred years ago was deemed the responsibility and prerogative of the parents, has not today to some extent at least been imposed upon the public school system by our citizenry? Everything from dancing lessons to how to saw a board to body hygiene. Can it be questioned that our citizens expect and demand that our public schools teach manners and morals and that these manners and morals be taught consistent with the prevailing thought of the majority? Whatever we may think about it, however we may deplore it, a fact of existence in this country and this state today is that a great proportion of our parents have abdicated their parental duties and authorities except in a most general way and insist these are the responsibilities of the public school system.

And during the time of change from learning at mother's knee to manners and morals and art appreciation being taught in our

public schools, we have also gone from allowing our youth to be educated as might be deemed best by their parents to compulsory education, the violations of the laws with respect thereto being crimes.

We have gone from the day of the solicitation of funds to hire a school master to probably the major part of the budgets of state and local government being applied to our public schools, colleges and universities.

Irrespective of the wisdom of having the mandatory, mass education system which we do have, it is the decision of our people that it be. I cannot and do not question the legality of this decision. I cannot and do not question the authority of the people of this state, speaking through their constitution and their legislature, to have entrusted to their duly elected and appointed school officials responsibility and authority respecting many matters concerning their children which a few years past would have been considered the exclusive prerogative and duty of the parents. Among such matters which have been entrusted to the school authorities are those of dress and appearance and conduct during school hours or on school property. I firmly believe the legislature could require that all persons over six and under sixteen attend public school six days per week and wear a uniform specified by the legislature; by the same authority the legislature has authorized the public school authorities to adopt reasonable rules and regulations respecting appearance, conduct and attire. So long as the regulations adopted are reasonable, so long as they do not exceed the authority constitutionally delegated by the legislature, they will not be abrogated by this court.

It once was and probably still is the law of this state that a father may require his minor child to work and the father receive the benefit of that work. The only exceptions to this today known to the court are our laws respecting child labor and education. Despite what some misbelieve from false impressions created through mass news and entertainment media, it is still the law of this state that parents may use reasonable force and other reasonable measures in disciplining their minor children. Although some of our minor youth seem to believe they have the right to question the exercise of parental authority, and although a regrettably large number of our parents seemingly permit their children to exercise such a supposed right, fortunately the great body of our citizens and our legislature have not seen fit to create any such right. Parental authority and parental responsibility still have some legal standing. Our public schools have not yet quite become creches. There is the legal duty on parents to provide for the entire physical, mental,

spiritual, educational and moral welfare of their children until school age, and part of this responsibility continues afterward. With this responsibility there is authority.

Would anyone contend that procedural due process of law requires special notice, procedure, hearing or review for reasonable disciplinary action by parents exercising such residual parental authority as they yet have? Morally and philosophically this court is compelled to answer this question with a resounding no.

If parents cannot be required to provide procedural due process of law with respect to parental authority, can due process be required of the public school system standing in loco parentis? Phrased differently, our citizens having by constitutional mandate provided for transfer of certain parental obligation and authority from parents of children of mandatory educational age and put this authority and responsibility in school officials, can one or more of the children or parents complain of the exercise of this authority in the manner it could be exercised by a parent — i.e., without notice, hearing, confrontation of witnesses, stay, appeal? Is there any logical distinction between the mode of exercise of parental authority by a parent and the mode of exercise of parental authority by a governmental agency in loco parentis? Does the fact of removal of the authority from the private to the public realm change the manner in which the authority must be exercised?

There is no doubt whatever in my mind that there is no right of procedural due process with respect to the disciplining of a child by a parent. There is no doubt whatever in my mind of the right of the parent to delegate this parental authority to another without the creation of any right of procedural due process in the child. Does the constitutional delegation of this authority by the citizens without the specific consent of the parent give rise to the right to procedural due process where the specific consent to the delegation would not? It is my opinion that no right to procedural due process arises by such governmental delegation, and this order is predicated primarily on this conclusion.

Furthermore, Florida law does not require attendance of school age children at a public school. Florida law requires the parent to provide schooling for the child from age seven to age sixteen. The public school is available for the use of the parent to meet this requirement. Therefore even the transfer of parental authority by the parent to the public school system is not required by law. To the extent not affected by individual economics or personal ability, the determination to meet the minimum educational requirement of the law by placing a child in the public school system

is that of the parent. To this extent at least, even in the case of the otherwise non-specifically assenting parent, the delegation of parental authority is specific. And in the case of the child under seven or over sixteen the delegation is absolutely voluntary and specific.

There are also practical considerations. The public policy determination involved in requiring the education of our young people is that the general public welfare is enhanced by our young people being indoctrinated with a modicum of knowledge and reason and awareness. This assumes, which assumption this court considers reasonable, that these children do not have the ability of adults. They may have the mental and physical endowments to acquire adult abilities of knowledge, awareness, wisdom and judgment, but it is assumed these abilities are latent. If this is a rash assumption, then certainly all of humanity's accumulated experience is worthless. Yet the thrust of the argument that due process of law must be accorded to these children by those entrusted with exercising parental authority over them is that they have the developed capacity to determine what is best for themselves. How else does the question arise? If these children have the wisdom to question determinations affecting their personal conduct, appearance and attire — teachings even more basic than reading, writing and arithmetic — do they not also have the wisdom to dictate academic matters? As we go through life we must continue to learn or gradually slip backward, and we can learn much from our children, but I will never concede that the role of the pupil is to teach and the role of the teacher is to learn.

Consider the chaos in our public schools if we are to permit seven-year olds and eleven-year olds and fifteen-year olds and seventeen-year olds to demand notice, time to prepare for hearing, hearing, confrontation of witnesses, stay of judgment, and appeal each time a school official charges one with violation of a valid regulation and proposes appropriate disciplinary action. In this respect there can be no logical distinction between a fifteen-year old who wants to wear his hair long and the seven-year old who does not want to wear a shirt.

Our public school authorities have had wished upon them much more than they have asked. This court will not impose upon them the impossible.

For the above reasons, the temporary injunction entered September 11, 1969 is quashed and the complaint dismissed.

"He that refuseth instruction despiseth his own soul: but he that heareth reproof getteth understanding." *(Proverbs:* Chapter 15th, Verse 32)